Fire and Rescue versus NAACP v. North Hudson Regional Fire and Rescue. I represent the North Hudson Regional Fire and Rescue, which I will probably refer to as regional or NHLFR multiple times. We're asking that this court reverse the order issued by the district court, which enjoined North Hudson Regional from using its residency requirement to hire new firefighters. So in doing so, we're asking this court to indicate that or to hold that the North Hudson Regional residency requirement does not violate Title VII. There's two written basis for this, Your Honors. First is under the Rickey case. Second is that the plaintiffs haven't been able to establish causation in the Fronfish case. And thirdly, there's issues with respect to causation that bar the entry of summary judgment in this case. Under the Rickey case, the plaintiffs and the trial court have interpreted Rickey very narrowly. And we submit to the court that the Rickey case is not limited to its facts and is broad enough to cover this case and provide North Hudson with a defense to the disparate impact claim. And the Rickey case is broad, and the court indicated its broad holding a couple of times, or actually repeated the case a couple of times in particular. Before its holding, the Rickey case said, We are adopting the strong basis and evidence standard to resolve any conflict between the disparate impact and the disparate treatment clauses under Title VII. Later on, when it got to its converse holding later on in the case, before that it indicated that the strong basis and evidence standard is being adopted and it applies to resolve competing expectations under the two prongs of Title VII. Well, that's not the holding, though. That's dicta, right? The converse holding? Well, Your Honor, if you call it a converse holding, I don't see the word hold in that part. It doesn't call it a holding, but what I would argue to the court, Your Honor, is that that's a necessary conclusion based on the court's holding. The court is saying that you can engage in race-conscious action if there's a strong basis and evidence that you're doing so to remediate disparate impact. Well, that's a strong basis. Even if we agree with you on that, that's a strong basis and evidence here. But if we were to find that this particular residency requirement has a disparate impact on African Americans, that that would be unconstitutional. Your Honor, in this case, and there's a bit of a history to this, but North Hudson Regional had been sued by a group of Hispanics. That was a promotional case based on a 2000 promotion. The case, I think, was probably 2002 and settled thereafter. But the fact that there were no Hispanic promotions in that round of promotions was a symptom of the fact that there were very few Hispanics in the department. And this is a community that's 70% Hispanic. So that promotional case was a symptom of the lack of a Hispanic representation in the department. And likewise, here in Africa, Americans are underrepresented. They are. They are. I can't dispute that there's two in the department. So there's evidence of disparate impact. Yeah, but they're not showing that the residency requirement is the cause of that. And that's what they're attacking here is the residency requirement. Well, I mean, if the causation is to cover them all, you're on a residency requirement. When was the residency requirement put in place? The Regional formed in 1998 and started operations in 1999. The towns had residency requirements and those carried over. So you carried those over. The residency requirement was not enacted as a result of the 2001 action by the Hispanic. That's correct, Your Honor. But an important thing here is... Okay, so how does that factor in under RIGI? Okay. What you had is in 2006... Because you didn't put that in to benefit the Hispanics, and the NAACP is attacking it. Right, Your Honor. But under the settlement agreement of the Rodriguez case and the Hispanic lawsuit, we agreed to take affirmative steps to increase new hires. Okay. Okay? When we received the letters from the individual plaintiffs in this case, that was April of 2006, we were in the midst of taking the affirmative steps under the Rodriguez settlement. So you have a scenario where, all of a sudden, our residency requirement now is being attacked or questioned by African Americans saying, we want these jobs. The decision had to be made, do we continue with the residency requirement or not? And at that time, put yourself in a circumstance. Here we are. We're a virtually all-Caucasian historical fire department or multiple fire departments before the region was formed. We get sued by Hispanics. We start taking affirmative steps to increase Hispanic hires. Just when the residency requirement is starting to take effect, if we said, okay, we're not going to follow it anymore, particularly on the facts of this case, which don't indicate that there's going to be a large increase of African American hires, and it's undisputed that it would be a detrimental impact to Hispanic interests. Well, you could have just modified the residency. You could have made a real residency requirement. This residency requirement is just a barrier to entry. You have people living 60 miles away. That's not a residency requirement. I mean, couldn't you have modified your residency requirement to make it a true residency requirement and then use that as a defense of a business necessity? Your Honor, under New Jersey law, I believe, and I'm not deciphering, once you've served in the department a period of time, you can move out of the jurisdiction. So it can't do that. But the residency requirement under state law, state law requires that you're allowed to move out of the jurisdiction. You can't move out of state. There's no laws that require you to move into the state. But I don't think we can hold that. What does state law say? It's under Title XI, Your Honor. I don't have a citation on that. Was that an effect when it began? I believe so, Your Honor. 2002? I believe so. Well, I don't think we can hold that in the jurisdiction. Mr. Goodwin, let me ask you something. You don't need to get to Rickey versus DiStefano in your case. If the court finds that there were disputed facts and summary judgment should not have been granted, one question that concerns me is where on the record do you object or argue that there is a different geographic market that should be used and the one that would be used by the district court in advance by their expert, Mr. Rickey? Your Honor, if the claims are correct in the equivalence case, we're probably just going to move off the state list to try and get the best candidates that are out there. And I don't think the claims dispute that we can go statewide. So we haven't challenged their particular market. They asked for tri-county. They said that's the geographic market. Candidly, that's a little arbitrary. I don't know how you shut out Bergen County, which is adjacent to the region. Bergen County is closer than some of the people in Essex. Yeah, Bergen County is closest. Union County doesn't even border the region at all. It doesn't count for that matter. Yeah, but that was part of the court's decision, was that there was no objection by you to the geographic market that should be used. But now you seem to be arguing that, at least in your brief, you argued that, yes, you did object to the geographic market. And that's one of the facts that is in dispute. Not really. Your Honor, if we can't keep the residency requirement, we're probably just going to go statewide, which would include the tri-county area. I think that would be good in terms of the existence of the law. So you're saying it shouldn't be three. It should be the entire state. Yeah, we can't have a residency requirement. We can't have a residency requirement. Mr. Coburn, we're going to put an additional two minutes on the clock for Mr. Coburn. Okay. Your Honor, I want to get back to Judge Fischer's question. If that's not your question or your disputed fact, which would require us to reverse, what is the crucial disputed facts for which there is an issue that the jury has to resolve? Your Honor, there's a few things. The Wright Report, Plaintiff's Expert Report, if you look through that report, he puts in these statistics that are based on protective services and they're based on public services and the number of African Americans that are in those categories. We're a fire department. We have probably 90 percent firefighters. We have virtually no other employees. So those statistics do not indicate that the residency requirement is the cause of the disparity. There's a disparity. There's no dispute. But the residency requirement has to be a cause. He says just this couldn't happen by chance and then he uses these statistics, which are suspect. And in this case, our report says that if you remove the residency requirement, you may have a few more African Americans, but you're not going to resolve the disparity. So the residency requirement is not the cause. And then if you look back historically, you have the Bain case, which I cited, Plaintiff's distinguished set of different set of facts. It's geographically identical to the regional. It's on the other end of Hudson County. It's closer to Union County. It's closer to North than the regional. There's nothing in the record that says this case is going to be different. Removing the residency requirement will result in more African Americans. Siskin's evidence, your own expert's evidence, indicated that if you remove the residency requirement and you drew from the tri-caliber, that would increase the number of African Americans. That's only if all those people decide to take jobs within North Hudson Regional as opposed to their own jurisdiction. And there's a lot, and Dr. Siskin cited it in his report, that said that 80% of African American veterans take jobs in their own jurisdiction and 70% non-veteran African Americans take jobs in their own jurisdiction. But even if you assume we're going to get a few African Americans, it's not going to resolve the disparity. So the cause is not the residency requirement. We'll just assume that when we get rid of this, we're going to have more African Americans. Do we have to assume that the disparity would be resolved at the inception of the sort of new manner or method in which firefighters are chosen? I mean, well, is the question just whether the disparity will be resolved initially or whether the disparity will be resolved over the long term? Well, I think normally the way these cases are solved, most of the time these cases are in the context of an all-Caucasian workforce and a large African American population, like right next door, like the Harrison case. Okay, that's usually when they arrive. So they just look at the statistics and they say, you've created your prime facial case. Here, we've built evidence to show it's not going to help. I've got the Siskin report that shows you're not going to cure the disparity. We've got the NAACP's own presence that it doesn't help. And there's nothing in this record that's going to suggest that it's going to be different here. We have facts to counter those normal statistics that are used to create the issue of facts. So we're going to have to pay out these damages, not hire Hispanics. And then four years down the road, we're going to be in the same place paying them. Okay, Mr. Coven, we're running out of time. We'll be back on our clock. Mr. Corrigan. Good morning, Your Honors. May it please the Court. My name is David Corrigan. I represent six Hispanic innovators in this case. The facts with respect to my clients are simple and stark. They live in North Hudson. They rank very high on the civil service competitive list. If it weren't for the injunction that were entered in this case, they would have been hired as North Hudson Regional Firefighters. In addition, my clients are precluded from being firefighters in virtually any other town in New Jersey because of residency requirements which exist in virtually any other community, including Newark, Jersey City. And, in fact, some residency requirements have been imposed as a matter of consent which were issued many, many years ago. Why can't your clients challenge those residency requirements the same way that the NAACP is challenging this residency requirement? Well, there are probably two reasons. Number one, there's a practical reason in terms of the expense and cost in the neck of that. Number two, frankly, I don't think the residency requirements in Newark are unfair. I think the residency requirements are totally appropriate. Well, not only in your judgment matters, it's the constitutionality of those residency requirements, right? Your brief, I think, makes a relatively strong argument that the equities here are in favor of the client because you're saying that if the NAACP prevails here, you lose the benefit of the residency requirement that helps your guys. That's right. And yet the neighboring residency requirements block your guys. So it would seem some parallelism is required here, right? If this residency requirement is deemed invalid because of a disparate impact, then perhaps your clients have a similar claim against those other residency requirements. Perhaps they do, but I don't think they do because I think residency requirements serve an important purpose. Well, what's the purpose? These are not real residency requirements, as Judge Hardiman said. Well, what's the purpose? I can see if it requires you to live in the community so you're closer to the emergency, but that's not what this requirement does. Well, to answer Judge Hardiman's question, for 50 years by virtue of New Jersey state law, we had no choice but for the public employer to let firefighters live outside the community. That's a matter of state law. We can only do it up to the inception of employment. So what purpose does that serve? It serves the traditional purpose that they have an interest in their community, number one. Number two, even if they don't have to live in the community, there's no doubt that someone who grows up in the community is more likely to stay in the community. For instance, if you don't have a residency requirement. There is no length on the residency requirement. It doesn't say you have to be a resident for four years, six years, eight years. It just says you have to be a resident at the time the list is prepared. That's right. Your Honor, let me just say it again. If you're born in the community, if you're raised in the community, you're more likely to stay in the community even if you don't have to. You're more likely to stay. You have an interest. You're familiar with the community. I think, number one, it serves an important purpose. Number two, it should be within the discretion of the governing body as a political matter. Number three, it evens the playing field, especially for my guys. I mean, my guys, yes, Your Honor, I have a tremendous equity argument, and that's frankly what we've been agreeing to demonstrate that. And frankly, in terms of the, if I can just switch to the strong basis of evidence, let's say there wasn't a residency requirement in North Hudson. Forget about attacking the Newark residency requirement, which I don't think would be successful. I'd have a terrific case representing the interveners if there wasn't a residency requirement. I could talk about the disparate impact, the fact that we compete against everybody, not just the people in North Hudson. It's an uneven playing field, and I think we could have got an expert, obviously a statistical expert. We could have pointed out the consent order. The 20-year-old consent order, which imposed a residency requirement, was done for a reason. It was done because ultimately the court determined that a residency requirement would help the minorities who lived in the city. The same thing here. And let me just... Do it quickly, because you might be out of time. I'll just say what my clients want me to say. We're not asking for any special treatment because we're Hispanics. We're asking to be treated the same as everybody else. In fact, just one final point. Justice Scalia, in his concurrent opinion, talked about at some point legal protection issues are going to be implicated. Now, I didn't raise the issue, but certainly in terms of equities, we should prevail. Thank you. Let me ask you this question. Are we permitted to sort of... You talked about the equities. Are we permitted to balance the equities between the Hispanic intervenors and the African-American applicants? The answer is yes, but frankly, the use of the term... I wouldn't use the term equity. I would use it in terms of... As an affirmative defense, it's appropriate for you to consider that the residency requirement serves the salvatorean purpose of providing equal opportunity for my clients. That's what the case law is. The case law is against you on that, though. I mean, that's why I asked before. It seems to me that there are two choices here. You know, these North Hudson and Lake fire departments need to impose real residency requirements that even if they are deemed to have a disparate impact, they could well survive under the business necessity doctrine. But this sort of, you know, entry issue alone, can you cite any cases where the courts have held that that is a valid business necessity? I absolutely cannot cite any cases because this is a unique case. The respondents talk a lot about Harrison. Harrison is a totally different case where Harrison, at least at the time, was a white community next to... It was a white enclave next to Newark. This case is completely different because there are different interests, and this analysis should not be based on competing... race-based competing interests. Okay, thank you. Thank you. Mr. Rose? Thank you. May I please the court? We believe that the residency requirement has an adverse impact. I think that's been established and well conceded. And the only statutory defense is set forth in the statute itself, as to O1K, and the only statutory defense is the employer has the burden of persuasion, production and persuasion. Why do you say that the adverse impact has been conceded? I believe Mr. Kovlin conceded that it did have adverse impact, except that it wasn't causal. There was no causal relationship, but the courts have long held in the Supreme Court, going way back to the Hazelwood case, is that you can use statistics to infer discrimination. And here it is close to zero. Hazelwood was, I believe, an absolute zero case from 1973 or thereabouts. But the statute was amended in 1991 to state, to go back to the Griggs decision, essentially, and state that for adverse impact, the requirement on the defendant is to show or demonstrate that there is both, that the requirement is job related, and that it's a matter of business necessity. Here, there is neither business necessity nor any job relatedness. What's the relationship between the two? It seems to me that through their argument today, and perhaps more clearly in their brief, they do dispute causation. Yes. There's a dispute between Dr. Wright's report and Dr. Siskin's report. Not very much. Aren't those disputes enough to get them past summary judgment? I don't think so, because they both, in fact, Judge Debevos, explicitly relied heavily on the report of Dr. Siskin. Dr. Siskin made an assumption that people would go to their hometowns if they had a right choice, but that assumption is absolutely unfounded in the record, as the district court can denote. And many people do go to their hometown, but many people go other times than that. Let me ask you this, Mr. Wright. At the summary judgment stage, is it permissible to disregard my expert's report or not? I think in these circumstances, where the reports both show adverse impact, tremendous amount of adverse impact, and no business justification, there's not one word from Dr. Siskin about how it's reasonable to use the residency requirement. Don't the interviewers have a point here? If we affirm this judgment, isn't there something terribly unfair about the notion that these Hispanic firefighters lose the benefit of the residency requirement that puts them in good stead on the hiring list, while at the same time they're blocked from other opportunities in the very same counties that you want to measure from because of residency requirements that are in effect? That's really a matter of state law. The Supreme Court in New Jersey said that residency requirements are permissible. In fact, if you go to a place like Newark, where they have about a 40% black workforce and 30% Hispanic workforce, and they have a substantial population of black, white, and Hispanic, and it works there, that's Mr. Carlin. How does it work for these six individuals? Let me finish my question. Can these six individuals, because of their lacking on the list, go to Newark and get jobs? They're going to get bounced from this list. The evidence is pretty clear. They would like to work as firefighters, so why not? Can they go to Newark and get those jobs based on their current position on the state list? All they can do is to compete on any list that they're eligible to compete for. If they have very expressive performance, they can use that. If they don't, they can't use the very list. Are they eligible to compete on the Newark list? No, sir. Why not? Because the Supreme Court of New Jersey has held that Newark, New York, they have a constitution, they have a residence requirement, and it's not in that context, it's not hurting the national group, and even though the national gender group is there. So, yes, the Eclipsa, the Eclipsa, there's nowhere for them to go. Are they going to become firefighters? They can without the water switch. In fact, Judge Demogorgon's last plan back then, while there are inconsistencies and unfairness in the overall system, but those kinds of unfairness are not before him in this case, which is in order to the NACB and the region. And that's really, I think, our whole point. I think the Lewis case, Lewis v. City of Chicago, is absolutely clear. It says, by enacting 2000E2K1, Congress allowed claims to be brought against the employer who uses the practice that causes disparity impact. But everyone knows and everyone has used the same practice in effect. If that effect was unintended, that's a problem for Congress to fix. It says not the federal courts. I think that's the longest country the Supreme Court spoke last year. That's the Lewis case, and I don't think there's any serious doubt that that's exactly what the statute says. What effect does Rickey have on this if we assume, as you have, that there are no genuine disputes to be resolved? I don't think Rickey would want it. Rickey was a disparate treatment case, and it had some discussion of disparate impact also. But Rickey, as you all have been saying, Rickey did not involve disparate impact, and it was a paragraph from Rickey that was quoted by the Supreme Court in Lewis to say that there are a lot of innocence that's set out. The disparate impact law is not affected by Rickey because there is a disparate impact and because the burden on the defendant is to show both business necessity and values. So I think it ought to be heard. I think the judge had a place where to make some opinion, and that's all I have to say. Okay. Thank you. Thank you, Mr. Rose. Mr. Coburn on rebuttal. Thank you, Your Honor. Just so the record's clear, I haven't conceded cause, obviously. I'm saying that there is a disparity between the ladies. What did you say? I have not conceded causation. Just so the record's clear, Mr. Rose indicated that I conceded that. Well, he said he conceded disparate impact but challenged causation. Yeah. I'm saying that the residency requirement is not the cause of the disparity. But there is a disparate impact. No. I'm not saying there's a disparity. Not a disparate impact caused by the residency requirement. And there's a very big difference. I'm not saying there's a disparate impact. We're just talking about what the statistics tell us. I believe Mr. Rose actually said you conceded there was an adverse impact. Yeah. What I'm saying is that there is a disparity between the number of African Americans we have working for us and the labor market that was defined in this case as the Trotter County area. I'm not conceding that the cause is the residency requirement. Okay. We've gone into that. But, Your Honor, one of the things I'd like to address, Judge Greenaway talked about the equities to the Spaniards. And the way this comes into play is it relates to the strong basis in evidence. If you try and play out a case that would have been brought against the region if we abandoned the residency requirement at that time, all those facts would have been put in front of a jury. And a jury would have been intrigued by that and would have easily found liability to the region. How is that possible? The residency requirement is applicable to everyone, not just Hispanics. But we have a population of 70% Hispanics. We're traditionally a more Caucasian force. Just as the residency requirement started to result in Hispanic hires, we would have eliminated it. And the plaintiffs in a theoretical case brought by the Spaniards would say, Wait a second, you're doing this? That's in the interests of African Americans? That's a disparate impact case, not a disparate treatment case. That's a disparate treatment case. Just when the residency requirement is starting to help us, you intentionally go against our interests in favor of curing a disparate impact. That's exactly what Ricky's about. Disparate treatment is about discriminating against particular individuals in particular cases, removing a race-neutral residency requirement. How can that give rise to a disparate treatment case? It could easily give rise, under the right facts, to a disparate impact case. But how can removing a race-neutral residency requirement give rise to a disparate treatment case? Because of the facts and the circumstances, we are sued. We agree to take affirmative steps then. As it's starting to have the desired effect of having more Hispanics in the department, we decide we're going to remove it. We're going to act against the Hispanic interest, intentionally, to try and resolve a disparate impact. And on the facts of this case, in order to be presented, that's just pretext. You're elevating the interests of African Americans over Hispanics on a pretext that's going to solve a disparate impact. And on the facts of this case, it won't be. The plaintiffs will argue it's just pretext. Because there's no facts to show that you would actually resolve this disparity with the African Americans. We would have been accused of elevating one minority's interest over another. And a jury in New Jersey would buy into that. And we would never get a case, and plaintiffs in New Jersey are burning these cases in state court, or in the LAD, and we would never get a throw-out on summary judgment. It would be a real case. It's hard to envision it because we're in this context now. But that would be a real case. And just imagine it. Just as you start to help us, you need to remove the residency requirement? And under the facts of this case, for the benefit of Caucasians? That's what the result would be. That would be a plaintiff's murder if it's elevated in that case, Your Honor. I mean, it would have been a golden case. And we're going to have to fight it. So we're going to lose anyway. Thank you, Mr. Kovner. We thank counsel for their excellent arguments, and the case will be taken under advisement.